**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)**

| | | |
|---|---|---|
| PSG OF SARASOTA, LLC a/k/a<br>IV SOLUTIONS RX | : | |
| | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:26-cv-01937 |
| | : | |
| v. | : | |
| | : | |
| VALERIE CAMPBELL | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

FP 63658016.8

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................................... 1

II.  FACTUAL BACKGROUND ........................................................................................... 1

   A.  What IV Solutions Does. ........................................................................................ 1

   B.  Campbell's Employment at IV Solutions. .............................................................. 2

   C.  Resignation Letter................................................................................................... 4

   D.  Client Confusion and Concerns............................................................................... 7

III.  ARGUMENT .................................................................................................................. 8

   A.  Standard of Review................................................................................................. 8

   B.  IV Solutions is Likely to Succeed on the Merits. ................................................... 8

     1.  IV Solutions Is Likely to Prevail on Its Breach of Duty of Loyalty Claim Against Campbell.................................................................................................................. 9

     2.  IV Solutions Is Likely to Prevail on Its Trade Secrets Claims. ................................... 11

     3.  IV Solutions Is Likely to Succeed on Its Unfair Competition Claim. .......................... 13

   C.  IV Solutions Faces Irreparable Injuries in the Absence of Relief. .................................. 14

   D.  The Balance of Equities Favors IV Solutions. .................................................................. 15

   E.  Granting an Injunction Is in the Public Interest. .............................................................. 16

IV.  CONCLUSION ............................................................................................................... 17

FP 63658016.8

For the reasons set forth below, Plaintiff PSG of Sarasota, LLC a/k/a IV Solutions RX ("IV Solutions") respectfully requests a temporary restraining order and, thereafter, a preliminary injunction against Defendant Valerie Campbell ("Campbell").

## I.  INTRODUCTION

Campbell was and is an employee of IV Solutions.  In a move of almost unimaginable audacity, when she submitted her notice of resignation to IV Solutions, Campbell included in her resignation letter a list of patients that IV Solutions, her employer, would no longer need to provide services for. Campbell, a nurse who provided in-home infusion services to patients who received that care through IV Solutions, had spent significant time while working for IV Solutions diverting patients to one of IV Solutions' competitors, a hospital that Campbell apparently hoped would be her future employer—and ultimately will be. Her breach of her duty of loyalty is shocking; the disregard she showed for the patients who were receiving medical care from her through IV Solutions is appalling.  The Court's immediate intervention is required to protect IV Solutions' clear interest.

## II.  FACTUAL BACKGROUND[1]

### A.    What IV Solutions Does.

IV Solutions is an independent specialty pharmacy and home infusion provider that provides medication and comprehensive support to help patients treat and manage complex health conditions. *See* Declaration of Victoria L. Starr at ("Starr Dec.") at ¶¶ 5-6. While IV Solutions employs or engages with a number of people to ensure that those services are provided with reliability, consistency, and care, the direct medical care is provided by nurses that IV Solutions employs throughout the country. *See* Starr Dec. at ¶¶ 10-12. Those nurses are, in effect, the face

---

[1] The allegations supporting the Motion are set out in more detail in the Complaint.

of the company, often visiting patients in their homes and ensuring that those patients receive their medication in a timely, safe, and monitored fashion. *See* Starr Dec. at ¶¶ 10-16.

### B. Campbell's Employment at IV Solutions.

Campbell joined IV Solutions the winter of 2024 as a nurse, providing in-home services to IV Solutions' patients in Maryland. *See* Starr Dec. at ¶ 26. Specifically, IV Solutions assigned her to visit its patients in their homes, assess their medical condition in order to determine that the medication could be safely dispensed and that no additional medical care was required prior to dispensing the medication, and provide appropriate prescribed medication via infusion. *See* Starr Dec. at ¶¶ 10-25 & 27.

Although IV Solutions does not have nurses such as Campbell sign individual restrictive covenant agreements, IV Solutions sets out its expectations as to customer privacy, protections of its confidential information, and employee loyalty in several different policies and procedures. *See* Starr Dec. at ¶¶ 25, 50, 52, & 56. For example, in its Confidentiality and Financial Incentive Attestation Policy, a true and correct copy of which is attached to Plaintiff's Complaint for Damages and Injunctive Relief (the "Complaint") as Exhibit F, IV Solutions employees were advised that areas of concern included:



    c.  Accepting favors, financial or otherwise, from an outside person or organization that may affect the employee's judgment in making decisions related to IV Solutions Pharmacy.

    d.  Using information to which an employee has access by reason of his or her position by disclosing such information to competitors (e.g., financial information, technical information, or trade secrets) or using such information for his or her own benefit.

*See* Starr Dec. at ¶ 60. These concerns were further articulated in the Conflict of Interest

Guidelines, a true and correct copy of which is attached to the Complaint as Exhibit B. *See* Starr

Dec. at ¶¶ 50-52. The Conflict of Interest Guidelines, which Campbell signed on January 29, 2024,

clearly advised Campbell that "no employee is permitted to participate in any activity that is in

direct competition to the pharmacy or accept financial gain through that activity." *See* Starr Dec.

at ¶¶ 50-52.



## Conflict of Interest Guidelines

**Pharmacy Policy:** All staff should conduct business in an ethical manner and have no conflict of interest with any associated party.

**Definition of Conflict of Interest:** a conflict between the personal interests and needs of a health care provider and his or her professional responsibilities toward a patient or other consumer (for example, if financial gain is based on a particular outcome or use of one drug rather than another).

No employee is permitted to participate in any activity that is in direct competition to the pharmacy or accept financial gain through that activity. A conflict of interest includes but is not limited to:

- Ownership interest of greater than 5% between any associates.
- A significant professional or financial relationship.
- A direct or indirect financial incentive.
- A known familial relationship

The Business Code of Conduct, a true and correct copy of which is attached to the Complaint as

Exhibit G, likewise instructed employees that they were expected to perform their duties with "the

utmost integrity, ethics, respect and accountability," which include honesty, loyalty, and fairness.

*See* Starr Dec. at ¶ 61.

Employees were further reminded of the mandate that patient information be maintained

as confidential through multiple policies, enforcing not only the need to protect such information

as the proprietary information of IV Solutions but also consistent with federal and state law

governing patient confidentiality. *See* Starr Dec. at ¶ 59. For example, in the Pledge of

Confidentiality Campbell executed on January 29, 2024, Campbell agreed that:

> Information regarding a patient of the pharmacy shall not be released to any source outside of the pharmacy without the signed permission of the patient. Furthermore, information will only be released internally on a need-to-know basis. All employees will not discuss patient cases outside the pharmacy or with anyone not employed by the pharmacy unless they are directly involved with the patient's case.

*See* Starr Dec. at ¶¶ 52-55. This clear mandate is reinforced in IV Solutions' Regulatory

Compliance Policy, attached to the Complaint as Exhibit E, which makes clear that patient's

medical information, including the patient's name, must be maintained as confidential:

- PHI: Protected Health Information is protected under state and federal privacy and security laws. Patients' medical information and their names, addresses, phone numbers, dates of birth, and social security numbers must be kept confidential.
- PII: Personally Identifiable Information should be protected. PII is information that has the potential to be used to identify or locate a particular patient. It includes credit card data, driver's licenses, and e-mail addresses.

*See* Starr Dec. at ¶ 59. IV Solutions made clear to its employees that it expected them to observe

the highest standards of patient care and ethical conduct at all times while employed at IV Solutions

and to adhere to all applicable legal duties and obligations. *See* Starr Dec. at ¶ 62.

### C.    Resignation Letter.

On April 26, 2026, after just over two years of employment with IV Solutions, Campbell

sent her notice of resignation via email to Victoria L. Starr, IV Solution's COO. *See* Starr Dec. at

¶ 28. She gave three-weeks notice, setting her resignation date as May 15, 2026, and offering the

usual platitudes about her appreciation for her time at IV Solutions. *See* Starr Dec. at ¶ 28. In her

notice of resignation, Campbell stated that she "had decided to pursue new opportunities that align

4

more closely with [her] long-term career goals."[2] She then provided in her resignation email three separate lists of customers:

- "a list of patients that will need a new nurse to take over care";

- "a list of patients that will need to be discharged from IV Solutions as they are going to receive their treatment at the infusion suite of Dr Herrera"; and

- "a list of [medication name] patients that need to be discharged."

*See* Starr Dec. at ¶¶ 28-35. Those three lists included the name of each patient and, in some cases, information on the medication and treatment dates for that patient. *See* Starr Dec. at ¶ 33. Campbell listed approximately *eighty* patients on the lists of patients that, per her declaration, needed to be discharged, rather than have a new IV Solutions nurse assigned. *See* Starr Dec. at ¶ 34. There were only 14 patients that Campbell decided should continue to receive care through IV Solutions and should be assigned to a new nurse. *See* Starr Dec. at ¶ 35.

Starr followed up immediately with Campbell to try to ascertain what Campbell meant by her resignation letter in which Campbell was directing IV Solutions to discharge patients and, in some cases, specifically identifying the doctor who would provide care to those patients going forward. *See* Starr Dec. at ¶ 36. Campbell admitted that, although she did not have a job offer from TidalHealth, the hospital at which Doctor Herrera is expected to affiliate with in the near future, Campbell was attempting to divert patients to that hospital system and using her ability to divert business to the hospital in her effort to obtain a position with the hospital system.[3] *See* Starr Dec.

---

[2] A copy of the April 26, 2026, resignation email is attached to the Complaint as Exhibit A, with the names and medical details of the patients redacted.

[3] Dr. Ivonne Herrera, the doctor specifically referenced in the resignation letter as the doctor who would be providing infusion services at an infusion suite for more than 30 of the listed patients going forward, has disclaimed any knowledge of Campbell's efforts to divert patients to the infusion clinic at TidalHealth. IV Solutions anticipates that discovery will clarify further Dr. Herrara's role, if any, in Campbell's misconduct and may take action as needed to protect its goodwill and confidential information if such action is warranted. *See* Starr Dec. at ¶¶ 72 & 74.

at ¶¶ 39-40. In short, Campbell was using patients as bargaining chips in her effort to get a new job.

The misconduct revealed in the resignation letter and Campbell's communication with IV Solutions management were confirmed in her conversations with other IV Solutions employees. On April 27, 2026, an IV Solutions nurse reported that she had received a call from Campbell and that Campbell said that he had resigned from IV Solutions and had taken a position with Dr. Herrera at Tidal Health. *See* Declaration of Christine Bradford ("Bradford Declaration") at ¶¶ 5-6. Campbell further told the nurse that she knew one of the clients assigned to that nurse was a distance for that nurse to travel to so the nurse could send that patient, or any other patients that the nurse did not want to keep, to the infusion suite at Tidal Health. *See* Bradford Dec. at ¶ 7. Campbell was apparently not satisfied with soliciting patients that she worked directly with for the hospital she wanted to work for; she was asking other IV Solutions employees to solicit other patients to leave IV Solutions and instead get their medical treatment through a competitor.

IV Solutions, through counsel, promptly notified Campbell that her conduct was a breach of her duty of loyalty and demanded that she immediately cease and desist from all patient solicitations. *See* April 29, 2026, Letter from D. Dorey (Fisher & Phillips LLP) to V. Campbell, a true and correct copy of which is attached to the Complaint as Exhibit H. *See* Starr Dec. at ¶ 66. Over the next few days, Campbell and IV Solutions agreed that Campbell would remain employed through May 15, 2026, based on Campbell's representation that she would no longer attempt to solicit IV Solutions patients to stop receiving services from IV Solutions or divert those relationships to another provider, and that those patients she had attempted to divert would continue to receive services through IV Solutions. *See* Starr Dec. at ¶¶ 67-70.

FP 63658016.8

Shortly after reaching this agreement, IV Solutions learned that Campbell had misrepresented her intentions and, in fact, was not only now working for a competitor but was continuing to divert patients to that competitor. *See* Starr Dec. at ¶ 71. On Friday, May 8, 2026, a patient who received services through Campbell notified IV Solutions that they were discontinuing services with IV Solutions and transferring to the infusion suite. *See* Starr Dec. at ¶72. In addition, numerous other patients identified in Campbell's resignation notice did or have confirmed that they will discontinue receiving care through IV Solutions. *See* Star Dec. at ¶¶ 71 & 72.

### D.    Client Confusion and Concerns.

IV Solutions has already lost some clients who were included in the lists submitted by Campbell, and it expects that it will continue to lose patients as a result of Campbell's misconduct. More troubling than the economic injury Campbell is causing to IV Solutions, however, is the confusion and concern her actions are creating for the patients. *See* Starr Dec. at ¶¶ 44-47. IV Solutions has fielded questions from some patients and their family members, expressing concern that they were losing the ability to receive their medical treatments at home; patients have also expressed to IV Solutions that they did not know that they had a choice in the matter and, as a result of Campbell's improper solicitation, felt compelled to get treatment at a hospital rather than continue to enjoy the convenience and privacy associated with at-home medical care. *See* Starr Dec. at ¶¶ 44-47.

In addition, IV Solutions has heard from certain patients that equipment and supplies had been removed from their homes following a visit from Campbell. *See* Starr Dec. at ¶ 73. The equipment and supplies belong to the patients, not IV Solutions and not Campbell, and the only reason to remove the equipment and supplies is if the patient was going to stop receiving at-home care, as provided by IV Solutions, and begin going to an infusion suite, such as the one at

7

TidalHealth, for care. IV Solutions is currently investigating the concerns raised by clients concerning the missing equipment and supplies.

### III.  ARGUMENT

#### A.    Standard of Review.

"The standard for a temporary restraining order is the same as a preliminary injunction." *Maages Auditorium v. Prince George's Cnty.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014), *aff'd*, 681 Fed.Appx. 256 (4th Cir. 2017). To obtain a preliminary injunction, the moving party must show (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20).  The moving party bears the burden of establishing all four factors in order to prevail. *See Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 746 (D. Md. 2020) (citing *Pashby v. Delia,* 709 F.3d 307, 320-21 (4th Cir. 2013)).

#### B.    IV Solutions is Likely to Succeed on the Merits.

As detailed in its Complaint, IV Solutions has asserted four causes of action against Campbell: (1) breach of duty of loyalty; (2) misappropriation under the Defend Trade Secrets Act. ("DTSA"), 18 U.S.C. §§ 1831 *et seq.*; (3) misappropriation under the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann., Com. Law § 11-201(c); and (4) unfair competition. As set forth below, IV Solutions is likely to succeed on all four claims and can satisfy the first factor required for the requested injunctive relief.

FP 63658016.8

**1.    IV Solutions Is Likely to Prevail on Its Breach of Duty of Loyalty Claim Against Campbell.**

"Under Maryland law, every employment contract contains an 'implied duty [of loyalty] that an employee act solely for the benefit of his employer in all matters within the scope of employment.'" *Philips North America LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796, *13 (D. Md. Sept. 9, 2020) (citing *Maryland Metals Inc. v. Metzner*, 282 Md. 31, 38, 382 A.2d 564, 568 (1978)). "While employed, an employee 'must refrain from actively and directly competing with his employer for customers and employees, and must continue to exert his best efforts on behalf of his employer.'" *Aarow Elec. Sols. v. Tricore Sys., LLC*, No. CV JKB-22-2363, 2024 WL 1443743, at *7 (D. Md. Apr. 3, 2024) (quoting *Metzner*, 282 Md. at 38, 382 A.2d at 568).

The facts alleged in the Complaint clearly demonstrate that IV Solutions is likely to prevail on its breach of the duty of loyalty claim. The evidence overwhelmingly supports the conclusion that Campbell was soliciting patients to transfer their infusion services from IV Solutions to Dr. Herrera/TidalHealth while she was employed by IV Solutions; the list of clients in the resignation letter that Campbell said would change providers after she left IV Solutions would seem to sustain no other interpretation. Some of those same patients have since ended their relationship with IV Solutions and stated that they intend to receive the same care from Dr. Herrera/Tidal Health or that they were told they had no choice in continuing their relationship and home treatments with IV Solutions. Campbell solicited IV Solutions' clients to stop doing business with IV Solutions and to begin doing business with TidalHealth, a competitor where Campbell hoped to parlay her relationships with the clients into a job; this may be the paradigmatic example of a breach of the duty of loyalty, and the evidence of the breach is overwhelming. *See C-E-I-R, Inc. v. Computer Dynamics Corp.*, 229 Md. 357, 369-70, 183 A.2d 374, 380-81 (1962) (employees breached fiduciary duty when they solicited employer's client while still employed, using relationships

9

developed on employer's time and at employer's expense); *see also EDI Precast, LLC v. Carnahan*, 982 F. Supp. 2d 616, 626 (D. Md. 2013) (no reasonable view of "honesty and fair dealing" that would allow employee to divert business opportunity away from current employer, and such "usurpation clearly is inconsistent with any sense of "loyalty"").

In addition, Campbell relied on IV Solutions' confidential and proprietary information in the solicitation of patients to move to a competitor, which also is a breach of the duty of loyalty. *See Fundamental Admin. Servs., LLC v. Anderson*, No. CIV. JKB–13–1708, 2014 WL 5797125, at *3 (D. Md. Nov. 6, 2014) (citing *Dworkin v. Blumenthal*, 77 Md. App. 774, 551 A.2d 947, 949 (1989)). Campbell was able to and has made multiple attempts to solicit the patients to move their relationships away from IV Solutions based not only on the personal relationship and good will that she developed with the patients while working for IV Solutions, but also based on her knowledge of the patient's medical needs and treatment plan, information that IV Solutions is mandated to keep confidential under federal and state privacy laws and that, compiled in IV Solutions' client management database, permits IV Solutions to provide services to those clients and be compensated for those services.

The fact that Campbell's employment with IV Solutions will end on May 15, 2026, does not mean that the injuries resulting from her blatant disloyalty will end or that injunctive relief is not appropriate. The operative question in determining whether an injunction is warranted must be whether the requested equitable relief will prevent future harm, and in this case the risk of harm to IV Solutions continues, as Campbell has clearly planted the seeds with more than 80 patients to try to grow the relationship on behalf of a competitor, and without injunctive relief IV Solutions cannot prevent Campbell from building on her pre-resignation efforts in an attempt to divert the patients to a different provider of infusion services. Injunctive relief in such circumstances is

10

warranted. *See C-E-I-R*, 229 Md. at 369-70, 183 A.2d at 381 (remanding matter to trial court for entry of an injunction preventing employees from bidding for business of former employer's client because of unfair advantage obtained as a result of breach of fiduciary duty).

### 2.    IV Solutions Is Likely to Prevail on Its Trade Secrets Claims.

In order to service the patients who received infusions as clients of IV Solutions, Campbell was provided access to substantial amounts of confidential client information compiled by IV Solutions, information that she was entitled to use only to provide services to those patients in the course of her duties on behalf of IV Solutions. In particular, with regard to the clients identified in her resignation letter, Campbell would have received a physical binder that contained substantial demographic information concerning the patient, information on the patient's medical condition and related medical issues that may impact the infusion protocol, relevant physician orders for the infusion, and rate flow sheets developed by IV Solutions for reference by the nurse in providing the treatment. To date, however, Campbell has not returned any of that information to IV Solutions and this information would prove invaluable in continued inducement of patients to terminate their relationship with IV Solutions and begin getting infusions through another provider.

"To establish misappropriation of a trade secret under federal law and Maryland state law, [a plaintiff] must demonstrate that the documents at issue are trade secrets, and that that Defendants misappropriated those trade secrets." *Brightview Group, LP v. Teeters*, 441 F. Supp.3d 115 (D. Md. 2020) (citing DTSA and MUTSA). With regard to the first issue, numerous courts in the Fourth Circuit have recognized that a medical provider's compilation of patient data may constitute a trade secret. *See, e.g., Samirah v. Dist. Smiles, PLLC*, No. CV MJM-21-829, 2025 WL 1018886, at *12 (D. Md. Apr. 4, 2025) (sensitive patient information may merit protection as a trade secret); *Maryland Physician's Edge, LLC v. Behram*, No. CV DKC 17-2756, 2019 WL 4573417, at *6 (D.

11

Md. Sept. 20, 2019) (patient list, which doctor agreed was employer's trade secret, was improperly acquired when taken for purpose of solicitation of clients).

These documents and the information within them qualify for trade secret protection under Maryland and federal law. As detailed herein, the information is subject to various efforts to protect the confidentiality of the information, including having Campbell executed the Pledge of Confidentiality and numerous policy documents that make clear the information is confidential and may only be used or disclosed for authorized purposes. Moreover, the information will have economic value for a competitor, in particular because the patient information has been compiled into a single source and IV Solutions' proprietary information on rate flows for that particular patient is included along with the patient data. A competitor, including the infusion suite to which Campbell was directing patients while still working at IV Solutions, could easily use this information to its competitive advantage and to the detriment of IV Solutions.

After demonstrating an item is a trade secret, a plaintiff must show that the defendant has misappropriated it." *Philips North America LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796, *10 (D. Md. Sept. 9, 2020).  Under the DTSA and MUTSA, IV Solutions does not need to establish that the trade secrets were taken through without authorization; instead, misappropriation may occur when a party misuses or improperly discloses trade secrets that the individual initially obtained with authorization. *Perez v. Blue Collar Scholars, LLC*, Civ. MJM-23-2198 (D. Md. Feb. 10, 2025) ("The statutory definition of 'misappropriation' also includes 'disclosure or use of a trade secret of another without express or implied consent by a person who …'"); *see also* 18 U.S.C. § 1839, 18 U.S.C. § 1839(5) ("the term 'misappropriation' means … disclosure or use of a trade secret of another without express or implied consent by a person who … acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of

12

FP 63658016.8

the trade secret"). Here, the evidence is clear that Campbell took information she was permitted to have and used it for impermissible purposes in soliciting patients to follow to a competitor.

### 3.    IV Solutions Is Likely to Succeed on Its Unfair Competition Claim.

Maryland courts have long recognized that unfair competition is actionable and injured parties are entitled to equitable and monetary relief. Although what constitutes unfair competition depends on the facts and circumstances of a particular case, each case is subject "to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception." *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 237, 34 A.2d 338 (1943). "Wherever, in any case, these elements of fair trade are found to be lacking equity will grant protection against the offending party." *Id.* "The legal principles which are controlling here are simply the principles of old-fashioned honesty." *Brightview*, 441 F. Supp. 3d at 134 (*citing Baltimore Bedding*, 182 Md. at 237).

Campbell's conduct – soliciting patients in an attempt to divert them to a competitor while still employed by IV Solutions – falls squarely within the definition of conduct that is unfair and dishonest. Pre-resignation solicitation of clients is not passive planning to compete *after* the resignation; it is an affirmative effort to redirect those relationships, and Campbell relied on the goodwill she built through her employment with IV Solutions to do so. In attempting to direct those patients to a competitor, her conduct was antithetical to IV Solutions business interests at a time when she still owed it loyalty and her best efforts to the employer. *See, e g., C-E-I-R*, 229 Md. at 367, 183 A.2d at 181; *Weichert Co. of Md., Inc. v. Faust*, 419 Md. 306, 19 A.3d 393 (2011). She did not disclose her disloyal actions to her employer and, when confronted about her misconduct, lied about both her past misconduct and planned misdeeds in order to convince IV Solutions to let her remain employed through the end of her notice period. Her actions are the

13

quintessence of unfair competition, and IV Solutions has and will continue to suffer from her dishonest and unfair behavior by the loss of patients, goodwill, and confidential information.

### C.     IV Solutions Faces Irreparable Injuries in the Absence of Relief.

Absent injunctive relief, IV Solutions faces irreparable harm from the loss of clients and goodwill and likely continued misuse of its trade secrets and confidential information. As several courts have recognized, "when 'the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.'" *See Ameritox, Ltd. v. Savelich*, No. CV WDQ-15-499, 2015 WL 13609789, at \*4 (D. Md. Feb. 25, 2015) (quoting *Gen. Parts Distribution, LLC v. St. Clair,* No. 11-CV-03556-JFM, 2011 WL 6296746, at \*6 (D. Md. Dec. 14, 2011)).

Here, IV Solutions has already lost patients as a result of Campbell's pre-resignation solicitation of the patients whom she visited at home to move to a different provider or infusion services, and – as far as IV Solutions knows – Campbell has not even begun employment with a competitor yet. Other patients may yet follow suit as a result of Campbell's breach of her duty of loyalty, particularly if she can build on that breach by follow-up solicitation once she has landed at a competitor. And the list of patients at risk is not limited to those identified in her resignation letter; as noted above, at least one IV Solutions employee was approached by Campbell about directing other patients, with whom Campbell did not work, to TidalHealth, where she was at that time looking for employment. The number of patients who may ultimately elect to leave IV Solutions because of Campbell's direct solicitations of patients and indirect solicitations through other employees is unknowable, and IV Solutions faces an irreparable injury from the loss of its clients and goodwill.

14

Moreover, Campbell has in her possession and has already misused for the benefit of a competitor IV Solutions' trade secret information, and any further use or disclosure of that information will constitute irreparable harm. *See Brightview*, 441 F. Supp.3d at 141 (finding that future use and disclosure of trade secrets presents irreparable harm through "the irreversible loss" of trade secrets). Campbell has highly confidential patient medical information, organized and supplemented with proprietary information by IV Solutions in a manner intended to maximize the value of that information in providing valuable services to patients and encourage their loyalty to IV Solutions; that information in the hands of a competitor would cause an irreparable injury to IV Solutions. Both federal and state trade secret law call for injunctive relief in instances of actual or threatened misappropriation. *See* DTSA, § 1836(b)(3)(A)(i) (courts may "grant an injunction to prevent any actual or threatened misappropriation"); MUTSA, § 11-1202(a) (providing that "actual or threatened misappropriation may be enjoined.").[4]

### D.    The Balance of Equities Favors IV Solutions.

The third factor required for the issuance of injunctive relief – the balance of the equities – unquestionably tips in IV Solutions' favor.  IV Solutions does not seek to prevent Campbell from continuing to work in the industry, or even to work for the very competitor she told other IV Solutions employees that she was going to work for. IV Solutions does not seek relief that would in any way impair Campbell's ability to earn a living. All IV Solutions seeks is an order enjoining Campbell from further benefitting from her disloyalty and dishonesty by allowing her to continue to solicit those clients she identified in her resignation letter as ones who were no longer going to receive services through IV Solutions. If, as she has repeatedly represented to IV Solutions when

---

[4] Notably, neither the DTSA nor the MUTSA state that a court must first find irreparable harm prior to issuing an injunction authorized by the statutes.

confronted about her misconduct, she has no intention of diverting these clients to a competitor, than the requested relief will cause her no harm, and certainly no harm greater than the irreparable injury faced by IV Solutions from the loss of its clients, goodwill, and trade secrets. *See Brightview*, 441 F. Supp. 3d at 141 ("Defendants, meanwhile, have produced no evidence of any harm that they will suffer if the Court enjoins them from using Brightview information during the pendency of the litigation. If Defendants truly have no intent to use Brightview trade secret or proprietary information going forward, then enjoining their further use of Brightview information will not cause them any harm.").

Moreover, to the extent there is *any* harm to Campbell if the requested relief is granted, it is the result exclusively of her own actions, in disregard of her duty of loyalty to her employer. As the Brightview court noted, "[t]his 'self-inflicted' harm is not enough to tip the equities in their favor." *Id.* at 142 (internal citations omitted). Campbell could have left IV Solutions and competed fairly to attract clients to any new employer with whom she obtained employment; instead, she tried to get an unfair head start, and she should not be rewarded by being able to continue to benefit from her misconduct.

### E.    Granting an Injunction Is in the Public Interest.

Finally, granting this injunction is in the public interest. As a matter of law, the public interest favors "the protection of trade secrets, and the prevention of unfair business practices." *Id.* As a matter of public policy, the facts detailed above explained why it is critical that Campbell be enjoined from soliciting the patients still at IV Solutions that she began attempting to divert while still working with those patients as an employee. Several patients or their families were confused by Campbell's attempts to move them from IV Solutions, and in some cases told IV Solutions that they did not understand that they had the option to continue to receive at-home

16

FP 63658016.8

infusions through IV Solutions and thought they had to begin getting their medications at an infusion suite. Misleading consumers is unfair and does not serve the public interest; misleading patients about whether they need to leave the privacy and safety of their own homes to receive needed medical treatments is scurrilous behavior, and an order enjoining such conduct is clearly in furtherance of the public interest.

## IV. <u>CONCLUSION</u>

For all the foregoing reasons, IV Solutions respectfully requests that the Court grant its motion for a temporary restraining order and thereafter a preliminary injunction and enter an order that:

(i) enjoins Campbell from initiating contact with any of the clients, or the families or treating physician(s) of those clients, who:

(a) were identified in the April 26, 2026, resignation letter and

(b) were, as of the date of the Court's Order, clients of IV Solutions

for the purpose of inducing, encouraging, or enticing those clients to cease receiving infusion services through IV Solutions;

(ii) compels Campbell to return to IV Solutions any and all records, information, or data that Campbell obtained from IV Solutions, including all records, information, or data derived therefrom;

(iii) compels Campbell to return to IV Solutions any property, equipment, or supplies that Campbell obtained from IV Solutions;

(iv) enjoins Campbell from using or disclosing IV Solutions' confidential information and trade secrets; and

(iii) enjoins Campbell from destroying evidence pertinent to this civil action.

FP 63658016.8

Respectfully submitted,

/s/ David R. Dorey
David Dorey
Maryland Bar No.: 2204110004
FISHER & PHILLIPS LLP
1401 New York Avenue NW
Suite 400
Washington, DC 20005
Tel.    (202) 978-9655
Fax    (202) 978-3788
Email  drdorey@fisherphillips.com

Alissa A. Kranz (*pro hac vice* forthcoming)
FISHER & PHILLIPS LLP
401 East Jackson Street Suite 3100
Tampa, FL 33602
Tel. (813) 769-7500
Fax. (813) 769-7501
Email  akranz@fisherphillips.com

Dated: May 15, 2026                *Attorneys for Plaintiff*

18