# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

PSG OF SARASOTA, LLC,                    *
*also known as* IV SOLUTIONS RX

       *                                                                                                                                 *

       *Plaintiff*,

                 *    Civil Action No. RDB-26-1937

       v.

                 *

VALERIE CAMPBELL,

                 *

       *Defendant.*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

# <u>MEMORANDUM ORDER</u>

This matter arises from a dispute between Plaintiff PSG of Sarasota, LLC *also known as* IV Solutions RX ("Plaintiff" or "IV Solutions") and its former employee Defendant Valerie Campbell ("Defendant" or "Ms. Campbell") regarding IV Solutions' confidential patient information. Between January 2024 and her resignation on May 15, 2026, Ms. Campbell worked as a registered nurse at IV Solutions, a specialty pharmacy that offers patients in-home infusion treatments. On May 15, 2026, IV Solutions initiated this action by filing in this Court a five-Count Complaint alleging that Ms. Campbell misappropriated confidential patient information while attempting to obtain employment with its direct competitor, TidalHealth Infusion Center. (ECF No. 1 ¶¶ 19–52, 109.) IV Solutions alleges against Ms. Campbell: (1) breach of duty of loyalty (Count I); (2) violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq.* (Count II); (3) violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), MD. CODE ANN., COM. LAW §§ 11-201 *et seq.* (Count III); (4) unfair competition (Count IV); and (5) temporary, preliminary, and permanent injunction (Count V). *See generally* (ECF No. 1).

1

Presently pending before this Court is IV Solutions' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 2) ("Plaintiff's Motion").[1]  Ms. Campbell has responded in Opposition (ECF No. 10), and, on June 8, 2026, this Court heard oral arguments from the parties, *see* (ECF No. 13).  For the reasons set forth on the record and elaborated below, Plaintiff's Motion for Preliminary Injunction (ECF No. 2) is DENIED.

## BACKGROUND

IV Solutions is an independent specialty pharmacy that employs registered nurses to provide in-home medical care, including infusion treatments, to patients.  (ECF No. 1 ¶¶ 1–2; ECF No. 2-2 ¶¶ 5–6.)  IV Solutions' Chief Operating Officer and Clinical Specialist, Victoria Starr ("Ms. Starr"), asserts that such nurses help IV Solutions develop customer goodwill by fostering relationships with patients during in-home treatments.  (ECF No. 2-2 ¶¶ 10–12.)  IV Solutions receives patients via referral from physicians, and it then assigns one of its registered nurses to each patient.

### I.    Ms. Campbell's employment with IV Solutions

Between January 2024 and May 15, 2026, Ms. Campbell worked as a registered nurse at IV Solutions.  At the hearing of June 8, 2026, Ms. Starr testified that Ms. Campbell became employed with IV Solutions after she responded to an online job posting.  Immediately prior to working for IV Solutions, Ms. Campbell worked at an infusion suite with Dr. Ivonne Herrera ("Dr. Herrera"), a dermatologist who refers patients for infusion treatments.  During the same period that Ms. Campbell responded to IV Solutions' online job posting, Ms. Starr

---

[1]  As confirmed with counsel on the record, this Court construes Plaintiff's Motion (ECF No. 2) as a Motion for Preliminary Injunction because Ms. Campbell had notice of the requested relief and filed an Opposition (ECF No. 10), and this Court held an adversary hearing on the matter.

separately coordinated with Dr. Herrera to take on her patients for infusion treatments. Specifically, Ms. Starr learned that Dr. Herrera intended to close one of her infusion suites and wished to refer patients treated at that suite to IV Solutions for in-home treatments.

Although Ms. Campbell worked at IV Solutions continuously between January 2024 and May 15, 2026, her status varied throughout her employment. IV Solutions employs both per diem nurses and full-time nurses. Per diem nurses work on a day-by-day basis, do not receive benefits, and do not have guaranteed caseloads. Importantly, IV Solutions permits per diem nurses to maintain dual employment, including employment with competitors. Unlike per diem nurses, full-time nurses receive benefits, have guaranteed caseloads, and are not permitted to maintain employment with its competitors. Between March 2024 and December 2024, Ms. Campbell worked as a per diem nurse. Between December 2024 and April 2025, she became a full-time nurse. Finally, from April 2025 until December 2025, she returned to per diem employment before again switching to full-time work in December 2025 through her resignation on May 15, 2026. At various times between January 2024 and May 2026, Ms. Campbell was dually employed with both Dr. Herrera and IV Solutions.

IV Solutions assigns patients to nurses based on the nurse's clinical skillset and caseload and the patient's age, gender, and medical needs. Its nurses are not permitted to select their own patients and should only refuse patients if their schedule is full. Some of Ms. Campbell's assigned patients had been referred by Dr. Herrera and already knew Ms. Campbell from her prior employment with Dr. Herrera. Many of these patients continued to receive medical care from Dr. Herrera throughout the period in which they received in-home infusion treatments from IV Solutions. Although Ms. Campbell also served patients who were referred to IV

Solutions by at least one other doctor, Dr. Michael Crouch, approximately 80 of her patients were referred by Dr. Herrera.

Ms. Campbell's duties included visiting patients in their homes, assessing their medical conditions, determining if medication could be safely dispensed, and providing prescribed medications via infusion. (ECF No. 2-1 at 4.) To facilitate such duties, IV Solutions provides registered nurses like Ms. Campbell with patient-specific binders containing confidential information pertinent to patient care, including: patient demographic and contact information, allergy and medical information, physician orders, treatment and infusion rate flow sheets, scheduling information, and other patient-care records. (ECF No. 1 ¶¶ 20–21.) It limits access to such information to personnel who need it to perform their duties, and it maintains policies and procedures to prevent unauthorized use of the information. (*Id.* ¶¶ 22–23.) Although IV Solutions does not require its full-time nurses to sign restrictive covenant agreements, it supplies customer privacy, confidential information, and employee loyalty expectations in several policies: (1) a Confidentiality and Financial Incentive Attestation Policy,[2] (*id.* Ex. F); (2) Conflict of Interest Guidelines,[3] (*id.* Ex. B); (3) a Business Code of Conduct, (*id.* Ex. G);

---

[2] In pertinent part, the Confidentiality and Financial Incentive Attestation Policy advises that employees shall (a) "Adopt a high ethical standard of conduct in performance of duties;" (b) "Observe laws and regulations governing business transactions;" (c) "Compete fairly with others;" . . . and (e) "Preserve the confidentiality of individually identifiable health information." (ECF No. 1-7 at 2.) It identifies "areas of concern," including: "Using information to which an employee has access by reason of his or her position by disclosing such information to competitors (e.g., financial information, technical information, or trade secrets) or using such information for his or her own benefit." (*Id.* at 3.)

[3] These Guidelines provide that "no employee is permitted to participate in any activity that is in direct competition to the pharmacy or accept financial gain through that activity." (ECF No. 2-1 at 5.)

(4) a Pledge of Confidentiality;[4] and (5) a Regulatory Compliance Policy,[5] (*id.* Ex. E).  Ms. Campbell signed many of these policies in January 2024.

## II.    Ms. Campbell's resignation from IV Solutions

In April 2026, Ms. Campbell accepted employment with TidalHealth Infusion Center ("TidalHealth"), a direct competitor of IV Solutions.  (ECF No. 10-2 ¶ 7; ECF No. 2-2 ¶¶ 39–40.)  During the same period, Dr. Herrera intended to open an infusion suite at TidalHealth and informed Ms. Campbell that she would stop referring her patients to IV Solutions and begin referring them for infusion treatments at TidalHealth's infusion suite.

On April 26, 2026, Ms. Campbell sent a notice of resignation via email to Ms. Starr.  (ECF No. 2-2 ¶ 28.)  She set her resignation date as May 15, 2026, and provided three separate lists of patients: (1) "a list of patients that will need a new nurse to take over care," which largely included patients referred to IV Solutions by Dr. Crouch;  (2) "a list of patients that will need to be discharged from IV Solutions as they are going to receive their treatment at the infusion suite of Dr. Herrera," which largely included patients referred to IV Solutions by Dr. Herrera; and (3) "a list of [medication name] patients that need to be discharged."  (*Id.* ¶¶ 28–35.)  According to Ms. Campbell, the patients in the third list were patients of Dr. Herrera who were scheduled for upcoming office visits.  Dr. Herrera informed Ms. Campbell that she

---

[4]  The Pledge of Confidentiality states:

> Information regarding a patient of the pharmacy shall not be released to any sources outside the pharmacy without the signed permission of the patient.  Furthermore, information will only be released internally on a need-to-know basis.  All employees will not discuss patient cases outside the pharmacy or with anyone not employed by the pharmacy unless they are directly involved in the patient's case.

(ECF No. 2-2 ¶¶ 52–55.)

[5]  The Regulatory Compliance Policy requires that patients' "medical information and their names, addresses, phone numbers, dates of birth, and social security numbers must be kept confidential."  (ECF No. 2-2 ¶ 59.)

intended to speak to those patients about transitioning their infusion services from IV Solutions to TidalHealth at their upcoming appointments. The list of patients who needed a new nurse included 14 patients, but the lists of patients to be discharged included approximately 80 patients. (*Id.* ¶¶ 34, 35.)

After IV Solutions requested clarification about the patients to be discharged, Ms. Campbell allegedly admitted that she was attempting to divert patients to TidalHealth. (*Id.* ¶¶ 39–40.) Plaintiff alleges that Ms. Campbell stated that she did not yet have a job offer from TidalHealth, but she hoped that her ability to divert patients would help her obtain a position there. (*Id.*) Both Dr. Herrera and Ms. Campbell currently work at TidalHealth, but Ms. Campbell testified that she had no formal job offer when she sent IV Solutions her notice of resignation. (ECF No. 10-2 ¶¶ 5, 7.)

Ms. Starr testified at the hearing of June 8, 2026, that she called each of Ms. Campbell's patients to determine whether they wished to continue treatments with IV Solutions. She understood after those calls that Ms. Campbell sought to divert patients to TidalHealth, but she acknowledged that she has no personal knowledge of such solicitation. On April 27, 2026, another nurse at IV Solution reported that Ms. Campbell had contacted her to state that she had resigned and to suggest that she could send patients to TidalHealth. (ECF No. 2-3 ¶¶ 5–6.) On April 29, 2026, IV Solutions' counsel sent Ms. Campbell a letter alleging that her conduct breached her duty of loyalty and demanded that she cease all patient solicitations. (ECF No. 1 Ex. H.) IV Solutions also sent a Notice of Violation of Duty of Loyalty and Cease and Desist letter to Dr. Herrera, (*id.* Ex. I). Dr. Herrera responded that "Valerie Campbell is not [her] employee and [she is] not a beneficiary of the pursuit described . . . ." (*Id.* Ex. K.)

Ms. Campbell and IV Solutions thereafter agreed that she would remain employed at IV Solutions through May 15, 2026, but she would not attempt to solicit its patients, and patients would continue to receive services through IV Solutions.  (ECF No. 2-2 ¶¶ 67–70.) On May 8, 2026, a patient who received services from Ms. Campbell informed IV Solutions that they were transferring to the infusion suite at TidalHealth.  (*Id.* ¶ 72.)  As of June 8, 2026, nine patients have informed IV Solutions that they are transferring to the infusion suite at TidalHealth. IV Solutions also alleges that patients have reported that Ms. Campbell removed medical items necessary for treatment from their homes.  Ms. Starr testified that IV Solutions had to replace medical equipment that had been removed from the homes of some patients. Ms. Starr further testified that patients have reported confusion about whether they are able to continue in-home treatment with IV Solutions.

At the hearing of June 8, 2026, Ms. Campbell testified that she never solicited patients to TidalHealth.  She stated that Dr. Herrera informed her of her intent to stop referring patients to IV Solutions and begin referring them to TidalHealth, but she did not participate in any effort to encourage patients to switch to TidalHealth.  She testified that in the week before she sent her resignation notice, she informed patients—many of whom she had known before she began working for IV Solutions in January 2024—that she was resigning.  Some patients asked about her next steps, and she informed them that she was switching her employment to TidalHealth.  She also testified that she never removed medical items from patients' homes, she has not visited any patient's home since her resignation, and she has not had contact with any of her former patients since her resignation.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).  In determining whether to issue a preliminary injunction, this Court follows the test set forth by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which requires a showing that:

(1) the movant is likely to succeed on the merits;
(2) the movant is likely to suffer irreparable harm absent preliminary relief;
(3) the balance of equities favors the movant; and
(4) an injunction is in the public interest.

*Id.* at 20.  The Court cannot issue a preliminary injunction unless the plaintiff makes a "clear showing" that all four requirements are satisfied.  *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 979 F.3d 219, 226 (4th Cir. 2020), *rev'd on other grounds*, 2 F.4th 330 (4th Cir. 2021).

## ANALYSIS

For the reasons set forth on the record and expounded below, IV Solutions has not met its burden to make a "clear showing" that it is likely to succeed on the merits of at least one of its claims in this case.  *See Leaders of a Beautiful Struggle*, 979 F.3d at 226.  IV Solutions contends that it is likely to succeed on the merits of its breach of duty of loyalty claim in Count I; its misappropriation of trade secrets claims under federal and state law in Counts II and III, respectively; and its unfair competition claim in Count IV.  Nevertheless, as explained at the hearing and below, it has not established at this preliminary stage that Ms. Campbell engaged in solicitation as required to establish breach of duty of loyalty or unfair competition.  Nor has

it shown, at this stage, that she likely misappropriated any trade secrets.  The Court addresses each claim in turn, grouping some claims together where appropriate.

### A. IV Solutions has not established a likelihood of success on the merits as to its misappropriation of trade secrets claims in Counts II and III

In Counts II and III, IV Solutions alleges that Ms. Campbell misappropriated trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq.*, and the Maryland Uniform Trade Secrets Act ("MUTSA"), MD. CODE ANN., COM. LAW §§ 11-201 *et seq.*, respectively.  The standards for misappropriation of trade secrets under both statutes are nearly identical: a plaintiff must show (1) that the documents are trade secrets and (2) that the defendant misappropriated them.  *See* 18 U.S.C. §§ 1836(b)(1), 1839(3), 1839(5); MD. CODE ANN., COM. LAW § 11-1201(c).  As explained on the record, at this preliminary stage, IV Solutions has not established the existence of a trade secret.

The DTSA and the MUTSA define a trade secret similarly.  *See Md. Physician's Edge, LLC v. Behram*, No. DKC-17-2756, 2019 WL 4573417, at *5 (D. Md. Sept. 20, 2019).  Both statutes require that (1) the information derives economic value from being not readily ascertainable and (2) the owner of the purported trade secret employs reasonable measures to keep the information secret.  *Id.*; *see* MD. CODE COM. LAW § 11-1201(e); *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 129 (D. Md. 2020).  Courts may consider factors such as: (1) "the amount or effort or money expended by [the plaintiff] in developing the information" and (2) "the ease or difficulty with which the information could be properly acquired or duplicated by others."  *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 95 (4th Cir. 2018).  As relevant to this case, this Court has recognized that "sensitive patient information" may be a trade secret.  *Samirah v. District Smiles, PLLC*, Civ. No. MJM-21-829, 2025 WL 1018886, at *12 (D. Md. Apr. 4, 2025)

(citing *Behram*, 2019 WL 4573417, at *5–6).  Patient information may not be a trade secret, however, where (1) it "'was developed as an incident of the practice' and was not the result of 'an extraordinary amount of effort or money' expended by the Plaintiff" and (2) "there were no rules, regulations, or known procedures which restricted the availability of the patient information only to select persons."  *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, Civ. No. SAG-18-2315, 2019 WL 2233535, at *17 (D. Md. May 23, 2019) (quoting *Allan M. Dworkin, D.D.S., P.A. v. Blumenthal*, 551 A.2d 947, 950 (Md. Ct. Spec. App. 1989)).

IV Solutions argues that the patient binders provided to Ms. Campbell are trade secrets because they compile sensitive patient information and proprietary treatment plans developed by its pharmacists.  As explained on the record, however, they have not shown at this preliminary stage that the content of the binders differs from the medical information available to *any* medical provider.  Where information "was developed as an incident of the practice" without evidence of "an extraordinary amount of effort or money expended," it generally is not a trade secret.  *Id.* at *17 (quoting *Allan M. Dworkin, D.D.S.*, 551 A.2d at 950); *see AirFacts*, 909 F.3d at 95 (explaining ease of discoverability of information is relevant to status as trade secret under Maryland law).  Thus, IV Solutions has not met its burden at this preliminary stage to demonstrate that it can likely establish the existence of trade secrets as required to succeed on the merits of its claims in Counts II and III.

**B. IV Solutions has not established a likelihood of success on the merits as to its breach of duty of loyalty and unfair competition claims in Counts I and IV**

Nor has IV Solutions shown a likelihood of success on the merits as to its breach of duty of loyalty claim in Count I or its unfair competition claim in Count IV. As to Count I, Maryland recognizes an independent cause of action for breach of fiduciary duty where a

10

plaintiff can "show (i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary." *Philips N. Am., LLC v. Hayes*, Civ. No. ELH-20-1409, 2020 WL 5407796, at *13 (D. Md. Sep. 9, 2020) (quoting *Plank v. Cherneski*, 231 A.3d 436, 466 (Md. 2020)). "Under Maryland law, every employment contract contains an 'implied duty [of loyalty] that an employee act solely for the benefit of his employer in all matters within the scope of employment.'" *Id.* (quoting *Md. Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978)); *Weichert Co. of Md., Inc. v. Faust*, 19 A.3d 393, 318 (Md. 2011). An employee may be liable for breach of a fiduciary duty where she engages in "a fraudulent, unfair, or otherwise wrongful act such as misappropriation of trade secrets . . . or interference with an employer's business opportunities." *EndoSurg Med., Inc. v. EndoMaster, Inc.*, 71 F. Supp. 3d 525, 556 (D. Md. 2014).

Nevertheless, employees are permitted to "prepare or make arrangements to compete with their employers prior to leaving," and, *after leaving*, a former employee "may solicit his former employer's employees and customers without breaching the duty of loyalty unless he does so through 'misuse of his former employer's trade secrets or confidential information.'" *Id.* (quoting *Metzner*, 382 A.2d at 568); *see also Fundamental Admin. Servs., LLC v. Anderson*, Civ. No. JKB-13-1708, 2014 WL 5797125, at *3 (D. Md. Nov. 6, 2014). Importantly, Maryland's highest court has held that "solicitation of employer's customers prior to cessation of employment" may breach the duty of loyalty. *Metzner*, 382 A.2d at 569 (citing *Ritterpusch v. Lithographic Plate*, 119 A.2d 392, 397 (Md. 1956)); *BEP, Inc. v. Atkinson*, 174 F. Supp. 2d 400, 406 (D. Md. 2001). To establish a likelihood of success on the merits of the breach of duty of loyalty claim in this case, therefore, Plaintiff must show that Ms. Campbell either solicited

customers prior to cessation of employment, misappropriated trade secrets, or engaged in some other misconduct.  As explained above and on the record, IV Solutions has not shown at this stage that it is likely to establish that Ms. Campbell misappropriated trade secrets.

Moreover, Plaintiff has not shown at this very early stage that Ms. Campbell breached her duty of loyalty by soliciting patients to a competitor while still employed with IV Solutions. Although Plaintiff presented the testimony of its Chief Operating Officer, Ms. Starr, regarding her impression from patients that Ms. Campbell sought to divert them to TidalHealth, Ms. Starr acknowledged that she has no personal knowledge of Ms. Campbell's conversations with any patients.  Ms. Campbell then testified that she never solicited patients or coordinated with Dr. Herrera to solicit patients.  The record does not contain any statements from patients that Ms. Campbell solicited them to TidalHealth.  IV Solutions represents that nine patients have ceased treatment with IV Solutions and commenced treatment with TidalHealth, but many— if not all—of those patients have consistently been treated by Dr. Herrera.  Thus, the limited record before the Court at this early stage suggests that patients may have chosen to follow Dr. Herrera to a new infusion suite without solicitation by Ms. Campbell.  Finally, the limited available record contains no evidence that Ms. Campbell used confidential patient information to solicit or contact patients *after* she terminated her employment with IV Solutions on May 15, 2026.  At this preliminary stage, IV Solutions has not established that it is likely to show that Ms. Campbell breached her duty of loyalty as alleged in Count I.

For similar reasons, Plaintiff also has not established a likelihood of success on the merits as to its unfair competition claim in Count IV.  Under Maryland law, unfair competition lacks specific elements but generally precludes "damaging or jeopardizing another's business

by fraud, deceit, trickery or unfair methods of any sort." *ClearOne Advantage, LLC v. Kersen*, 756 F. Supp. 3d 30, 43 (D. Md. 2024) (quoting *Balt. Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943)).  As Judge Bredar of this Court has explained, "[w]hile the standard for unfair competition is broad, it is not boundless; to recover, a plaintiff must show that the defendant's conduct damaged or jeopardized its business." *Id.* (citing *Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 585 (4th Cir. 2003)).  Use of confidential customer information to benefit a competitor in breach of a contractual obligation constitutes unfair competition.  *Id.* at 44. For the reasons set forth on the record and above, the limited record before the Court does not reflect that Ms. Campbell engaged in improper solicitation, deceit, or unfair methods.  At this preliminary stage, Plaintiff has not shown a likelihood of success on the merits of Count IV.[6]

---

[6] Failure to satisfy any one *Winter* factor precludes injunctive relief, but, for completeness, this Court briefly analyzes the remaining three factors.  The irreparable harm factor is neutral or slightly favors Plaintiff.  As noted on the record, Plaintiff may have shown irreparable harm because it has lost nine customers.  *See, e.g.*, *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 278 n.7 (4th Cir. 2025) (noting irreparable harm may exist based on permanent loss of customers).  Any harm to Ms. Campbell is negligible because she testified that she has not solicited any customers and her counsel represented that she will not solicit Plaintiff's customers in the future.  Yet, Plaintiff has not established at this stage that any improper solicitation occurred.  For similar reasons, the balance of the equities favors Plaintiff.  Where a preliminary injunction only prevents a defendant from misappropriating "trade secret and proprietary information," there is no real harm to the defendant.  *Brightview Grp.*, 441 F. Supp. 3d at 142.  "Finally, the public interest favors the protection of trade secrets, and the prevention of unfair business practices."  *Id.*  As Judge Bredar of this Court has aptly noted, however, "[t]here are countervailing public interests in fostering robust competition and in securing to each person the 'right to labor or use one's skills, talents, or experience for one's own benefit.'"  *ClearOne Advantage, Inc. v. Kersen*, 710 F. Supp. 3d 425, 438 (D. Md. 2024) (citing *Ruhl v. F. A. Bartlett Tree Expert Co.*, 225 A.2d 288, 293 (Md. 1967)). Absent a showing of unfair conduct or misappropriation, the public interests remain evenly balanced in this case.

**CONCLUSION**

Plaintiff has not met its burden to demonstrate a likelihood of success on the merits as to at least one of its claims.    Absent such a showing, this Court cannot exercise the "extraordinary" and "very far-reaching power" to issue a preliminary injunction. *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).  For the reasons stated at the hearing of June 8, 2026, and expounded above, it is this 9th day of June 2026, hereby ORDERED that:

1.  Plaintiff's Motion for Preliminary Injunction (ECF No. 2) is DENIED; and,

2.  The Clerk of this Court shall transmit a copy of this Memorandum Order to counsel of record in this matter.


/s/
_____
Richard D. Bennett
United States Senior District Judge